UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH PEERY, on behalf of himself and all persons similarly situated,<br><br>    Plaintiffs,<br>v.<br><br>CHICAGO HOUSING AUTHORITY and HOLSTEN MANAGEMENT CORPORATION,<br><br>    Defendants. | Case No. 13-cv-5819 related to<br>Case No. 13-cv-6541 |
| DEANN STUBENFIELD, JESSICA STUBENFIELD, DEBORAH THIGPEN, and SHARON THOMPSON,<br><br>    Plaintiffs,<br>v.<br><br>CHICAGO HOUSING AUTHORITY and THE COMMUNITY BUILDERS, INC.,<br><br>    Defendants. | Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

On June 16 and 17, 2014, this Court heard evidence and arguments on plaintiffs' Amended Motions for Preliminary Injunction [Dkt. 66. case no. 13 cv 5819; Dkt. 55. case no. 13 cv 6541].[1] Plaintiffs seek entry of a preliminary injunction enjoining the defendants from drug screening as a condition of residency in Chicago Housing Authority ("CHA") subsidized units in mixed-income developments. The defendants argue that the drug testing policy is solely the work of the private developers (The Company of Builders "TCB" and Holsten Management Company "HMC"), who are not state actors for purposes of the Fourth Amendment prohibition of suspicionless drug

---

[1] Plaintiffs are Joseph Peery, Deann Stubenfield, Jessica Stubenfield, Deborah Thigpen, and Sharon Thompson. Roy Thompson was previously dismissed.

1

searches, and even if they were, plaintiffs have consented to the searches. For the reasons set forth herein, the Court denies the motions.

I.     Background

The Court heard live testimony from Joanne Pastores Boy, the CHA's Rule 30(b)(6) witness, Peter Holsten, and Lee Pratter of TCB. Voluminous documentary and deposition evidence was provided to the Court, including the depositions of all named plaintiffs as well as Annie Stubenfield, Robert Koener, Jackie Holsten, Susan McCann of TCB, and others. The following facts are not in dispute for purposes of ruling on this motion.

*Plaintiff Joseph Peery*:

Peery lived at the CHA's Cabrini-Green housing complex from 1991 to 2005. The CHA razed the Cabrini-Green complex as part of the "Plan for Transformation." Residents obtained Section 8 housing vouchers to relocate to private housing. During this time, Peery moved to California. He returned to Chicago in 2009, wanting to live in the Cabrini-Green Area. He selected three housing location preferences: Parkside Phase 1B Rental, Old Town Village East II, and Old Town Village West. In June 2010, HMC personnel from Parkside contacted Peery to apply for a one-bedroom unit in Parkside Phase 1A (a condo building in which scattered units are rented to CHA tenants). Peery successfully completed the application process, including drug testing, and signed his lease on July 23, 2010. Peery has complied with the drug testing policy each year for renewal of his lease.

HMC is a private real estate developer that owns/manages Parkside among other buildings. HMC began using drug screening in the mid-1990s at several of its properties. HMC asserts that the drug screening policy at issue here is identical to the one it employs for all its buildings whether housing CHA tenants or not. According to HMC, it administers all aspects of the drug screening at Parkside, including paying all costs. HMC also attests that results of the tests are not reported to

CHA and there is no policy to advise CHA of any objections to the drug testing.

The Parkside development began in 2006 as part of CHA's "Plan for Transformation" for public housing in Chicago. The Cabrini Consent Decree created a Near North Working Group to select developers, provide overall direction, and monitor redevelopment of the former site of Cabrini Green. The Near North Working Group consisted of the Cabrini-Green Local Advisory Council ("LAC"), the CHA, the City of Chicago, counsel for the *Gautreaux* plaintiffs, and the Habitat Company, CHA's court appointed receiver. The Working Group sought proposals from private developers to redevelop part of the Cabrini site into mixed-income housing. The Working Group selected Parkside Associates, a partnership between Holsten Real Estate Development Corporation[2], Kimball Hill Homes, and the Cabrini-Green Local Advisory Council Community Development Corporation.[3] After going bankrupt, Kimball Hill Homes' share was divided between Holsten and the Cabrini-Green Local Advisory Council Community Development Corporation. The LAC Community Development Corporation is a 40% partner in Parkside. The same Working Group is responsible for the entire Cabrini-Green Area redevelopment and approved tenant selection plans and leases for eleven mixed-income developments. Of the eleven mixed-income developments, nine did not include drug screening as conditions of occupancy. The only two developments to include the drug testing provision are HMC managed.

Joanne Boy of the CHA testified that each site's private developer is responsible for drafting proposed lease agreements and a tenant selection plan. The CHA has minimum requirements for the tenant selection plans. The CHA's minimum tenant selection plan does not contain a drug screening policy. The developer presents the proposed lease and tenant selection plan to the Working Group for review and compliance with HUD regulations and City of Chicago ordinances. Once the Working Group approves a proposed lease and tenant selection plan, it publishes the lease and

---

[2] Holsten Real Estate Development Corporation is an affiliate of defendant HMC.
[3] LAC Community Development Corporation is the corporate entity of the Cabrini-Green Local Advisory Council.

3

tenant selection plan for public comment. The Working Group then recommends the lease and tenant selection plan to the CHA Board for approval. On June 20, 2006, the CHA Board approved the lease package and tenant selection plan for Parkside.

*Plaintiffs Deann Stubenfield, Jessica Stubenfield, Deborah Thigpen,* and *Sharon Thompson*

Plaintiff Deborah Thigpen lived in the Ida B. Wells and the Wells Extension during the 1990s until 2003. Between 2003 and 2005, Thigpen rented an apartment from a private landlord with a Section 8 voucher that she obtained in connection with her Relocation Rights contract with the CHA. Thigpen listed Ida B. Wells and the Robert Taylor Homes as her first and second choices for locations. Thigpen was offered an apartment in Oakwood Shores Phase 1A in 2005 when it was completed and signed a lease with TCB as lessor. The lease carries an addendum that requires drug testing. Thigpen has taken the drug test every year that she has lived at Oakwood Shores.

Plaintiff Sharon Thompson lived at the Ida B. Wells homes from 1977 through 2006, when she was offered and accepted a unit at Oakwood Shores Phase 2B. Thompson identified Lakefront as her preferred location for relocation. Thompson testified that she did not have an issue with taking a drug test when she initially entered the lease, but objects to having annual tests after living there for 7 years.

Plaintiffs DeAnn and Jessica Stubenfield are not parties to a lease, but live with their mother Annie Stubenfield, a lessee at Oakwood Shores Phase 1A. Annie Stubenfield is not a plaintiff in this case, despite claiming to object to annual drug testing despite submitting to the test for her initial lease. Once her daughters turned 18 and were also required to be screened annually, they objected as well.

Defendant The Community Builders ("TCB") is the management agent for the private owners of the Oakwood Shores property, pursuant to written agreement. It is also the partial owner of the developer for the rental portion of each Oakwood Shores phase. TCB represents that none of

4

the documents for the development and management of Oakwood Shores define TCB or any other owner entity as an agent of CHA. Oakwood Shores leases the land from the CHA that was formerly the site of four public housing projects known as Ida B. Wells, the Wells Extension, Madden Park, and Darrow Homes. TCB contends that the private owners are financially responsible for the success of the development and responsible to the private investors/lenders. TCB drafted the leas and tenant selection plan proposed to the Madden/Wells Area Working Group, and TCB staff decided whether to accept or reject suggested changes to the documents. TCB asserts that all Oakwood Shores tenants sign an identical lease that includes the drug testing policy regardless of whether they are CHA residents or market rate tenants.

Oakwood Shores is one of the mixed-income, mixed-finance developments that were built as part of the Plan for Transformation. Oakwood Shores consists of multiple phases, each owned by a private limited partnership. The Madden/Wells Area Working Group was responsible for overseeing the redevelopment of the Madden/Wells Area, including Oakwood Shores. The Working Group consisted of the Madden/Wells Local Advisory Council, CHA, City of Chicago, counsel for the *Gautreaux* plaintiffs, the Habitat Company (CHA's court appointed receiver), and representative from the 4th Ward Alderman's office (non-voting member). TCB decided to include the drug screening policy in its lease and tenant selection plan for Oakwood Shores at the behest of the Working Group. The only member of the Working Group to oppose the policy was Richard Wheelock, attorney for the LAC. The CHA did not take a position, except requiring all the sites and units have the same requirements. In an email to Lee Pratter, TCB project manager for Oakwood Shores from Jessica Caffrey at CHA, stating that "everyone in the working group preferred to have the drug testing like the rest of the site." (Plaintiff's Ex. 54).

**II.     Legal Standard**

In order to obtain a preliminary injunction, the plaintiff must show that (1) he has no

5

adequate remedy at law, (2) will suffer irreparable harm if a preliminary injunction is denied, (3) some likelihood of success on the merits, and (4) the balance of harms favors the moving party or whether the harm to the non-moving party or the public is sufficiently weighty that the injunction should be denied. *ACLU v. Alvarez,* 679 F.3d 583, 589 (7th Cir. 2012). Among these elements, the issues before the Court affect plaintiffs' likelihood of success on the merits more than any other element. On a plaintiff's motion for preliminary injunction the requirement for substantial proof is much higher than what is required on summary judgment. *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997). "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Id.*

### III. Discussion

#### A. *Likelihood of Success on the Merits*

Plaintiffs assert that the Chicago Housing Authority imposed, either directly or indirectly, the drug testing requirement, resulting in suspicionless searches in violation of the plaintiffs' Fourth Amendment rights. In order to succeed on the merits of their Section 1983 claims, plaintiffs must prove (1) action under color of law; (2) a search or seizure under the Fourth Amendment; and (3) that the search or seizure was unreasonable in the face of the government interests at stake and the circumstances of the search." *See, e.g., Bd. of Educ. v. Earls,* 536 U.S. 822, 830 (2002). Only the first two elements are at issue here: the existence of state action and consent to the search (taking the suspicionless drug testing outside the reach of the Fourth Amendment).

The facts demonstrate that it is the private developers (HMC and TCB) that administered the actual drug testing.[4] Generally, the conduct of private parties lies beyond the scope of the Constitution. *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 114 (1973).

---

[4] While plaintiffs dispute responsibility for the drug testing, the record is clear that only the private developers conduct the actual testing and obtain the results not the CHA.

6

Therefore, plaintiffs must demonstrate with clear evidence that the drug testing conducted by the private developers as part of the lease execution and renewal process constitutes state action. Even if plaintiffs demonstrate that the private developer's actions should be treated as state action, if any of the plaintiffs consented to the drug testing then there can be no constitutional violation.

   *1. State Action*

  The determination of whether a private entity is a state actor is "necessarily a fact-bound inquiry." *Brentwood Academy v. Tennessee Secondary School Athletic Association, et al.,* 531 U.S. 288, 298 (2001). "[S]tate action may be found if, though only if, there is such a 'close nexus between the state and the challenged action' that seemingly private behavior 'may be fairly treated as that of the state itself." *Id.* at 295 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). "[T]he purpose of the requirement is to assure that constitutional standards are invoked only when it can be said that the state is <u>responsible</u> for the <u>specific conduct</u> of which the plaintiff complains." *Blum v. Yaretsky et al.,* 457 U.S. 991, 1004 (1982) (emphasis added).

  The Seventh Circuit has characterized the determination of whether private behavior is state action as articulated in Supreme Court precedent not as a test so much as a series of examples in a fact-based inquiry. *Hallinan v. Fraternal Order of Police of Chicago,* 570 F.3d 811, 815 (7th Cir. 2009). The court in *Hallinan* lists the following examples: when private actors <u>conspire</u> or <u>are jointly engaged</u> (*Dennis v. Sparks*, 449 U.S. 24, 27-8 (1980)); where a state <u>compels</u> discriminatory action; when the state <u>controls</u> a nominally private entity; when it is <u>entwined</u> with its <u>management and control</u> (*Evans v. Newton*, 382 U.S. 296, 299 (1966); when the state <u>delegates a public function</u> to a private entity; when there is such a <u>close nexus</u> between the state and the challenged action that seemingly private behavior reasonably may be treated as that of the state itself. *Id.* It appears from the cases that this fact-based inquiry comes down to a matter of degree of involvement. Furthermore, the relationship/nexus/entanglement/entwinement between the state and the private entity must be on

the precise issue of which the plaintiffs complain, i.e. the drug testing policy.

Plaintiffs make two main arguments for why this Court should treat the drug testing policy as State action.[5] First, they argue that CHA has direct involvement in the challenged conduct because CHA has "absolute and ultimate control over tenant selection criteria" and has used this control to impose drug testing at Parkside and other developments. Second, plaintiffs argue that CHA and the private developers have a "symbiotic relationship" such that the action of the private developers may be said to be that of the CHA. Plaintiffs rely on the following to support their argument: the CHA's membership in the Working Groups; CHA's Board approval of the tenant selection plans and leases; the three-party leases between CHA tenants, the private developers and the CHA; the CHA's ownership of the land; the enforceability of CHA tenant relocation rights; and the CHA's duty to ensure the developments comply with federal law (HUD regulations).

Peery relies on several cases, including *McQueen v. Druker*, 438 F.2d 781 (1st Cir. 1971); *Male v. Crossroads Assocs.*, 469 F.2d 616 (2d Cir. 1972); *Halet v. Wend Co.*, 672 F.2d 1305 (9th Cir. 1982). The continued value of *McQueen*, however, was questioned in *Edwards v. Lutheran Senior Services, Inc.* because the court noted that *McQueen* was decided before the Supreme Court's decision in *Blum* made clear that extensive state financial support and funding, without more, do not establish a symbiotic relationship between a private entity and the state. 603 F. Supp. 315, 323 (D. Del. 1985).

In *Male*, welfare recipients residing in Peekskill, N.Y., alleged that rental agents at the Crossroads Apartments, a privately owned complex built as part of the Peekskill Urban Renewal Project, refused to consider them as applicants for housing solely because of their welfare status. *Male*, 469 F.2d at 617. The Second Circuit Court of Appeals found state action based primarily on the pervasive regulatory scheme under with the project proceeded. The court found

---

[5] This Court treats plaintiffs' arguments collectively since their position is nearly identical. However, in the Stubenfield plaintiffs' opening brief they addressed primarily whether CHA could claim a "special need" for the drug testing and only mentioned in passing that there is state action. *See Case No. 13 cv 6541, Dkt. 55*.

8

that the state's initial and continuing involvement in the construction and operation of the project was governed by a state or federal statute or rule. However, the mere existence of a regulatory scheme is insufficient evidence to establish State action. *See, e.g., Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177 (1972) (holding that the operation of the regulatory scheme enforced by the Pennsylvania Liquor Control Board does not sufficiently implicate the State in the discriminatory guest policies of Moose Lodge to make the latter "state action" within the ambit of the Equal Protection Clause of the Fourteenth Amendment.).

In *Halet*, the plaintiff claimed racial discrimination based on the private owner of an apartment complex having an adults-only policy. The court found that Halet had sufficiently alleged State action to proceed with his claim because, if proved, these allegations would place the County in a position of interedependence such that is a joint participant with defendant Wend. *Halet*, 672 F.2d at 1310. The court based its decision on the following allegations: (1) the County owns the land leased to Wend for the apartment complex; (2) the County acquired and prepared the land using federal and state funds and used federal services in dredging the harbor in the redevelopment area; (3) the purchase of land was part of a large redevelopment program; (4) the County leased the land to Wend for the benefit of the public in providing housing; (5) the lease prohibits race or religious discrimination; (6) the County oversees the development of the area and the design of the buildings and had final approval of all plans; (7) the County controls the use and purpose of the apartment and the rent charged; (8) Wend pays a percentage of the rentals to the County; and (9) Wend must abide by all the conditions of the lease. *Id.*

Plaintiffs also rely on *Airline Pilots Assoc'n v. Dep't of Aviation,* 45 F.3d 1144 (7th Cir. 1995), in which ALPA, the collective bargaining representative, sought to place an advertisement honoring the Air Wisconsin pilots in one of the display cases at O'Hare Airport. The district court dismissed for failure to state a claim and the Seventh Circuit reversed and remanded. The Seventh Circuit

9

found that the advertising agency's refusal to install the advertisement was a product of state action. In so finding, the Seventh Circuit pointed to four "tests" or "discernible situations" where the court will find state action despite the presence of a private party: (1) "symbiotic relationship" between the private actor and the State (*Burton,* 365 U.S. 715, 721 (1961)); (2) the "nexus test" where the State commands or encourages the private discriminatory action (*Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982)); (3) when a private party carries on a traditional public function; and (4) when the involvement of governmental authority aggravates or contributes to the unlawful conduct. *Airline Pilots Assoc'n (ALPA),* 45 F.3d at 1149.

Here, plaintiffs cannot show a sufficiently close nexus between the CHA and the private developers to establish state action. While the CHA is a voting member of both the Near North Working Group (Parkside) and the Madden/Wells Area Working Group (Oakwood Shores), the CHA is not the only member and there is nothing in the record to show that the CHA had greater voting power than any other voting member. In the case of the Near North Working Group, the same working group approved tenant selection plans and leases that did not include drug screening at nine out of eleven mixed-income developments. The only two to include testing are managed by HMC. Further, the record shows that HMC has used drug testing in its developments since the mid-1990s; long before HMC developed mixed-income housing that included CHA subsidized units.

Additionally, the record demonstrates that CHA had minimum tenant selection requirements, but that the private developers were tasked with establishing their own tenant selection plans and lease packages. The working groups had the authority to accept, reject, or make suggestions and revisions to the tenant selection plans and leases before putting them up for comment. Once approved in the working group, the tenant selection plans and leases were approved or rejected by the CHA board to allow the redevelopment plan to proceed to closing. Plaintiffs assert that CHA requires plaintiffs to enter three-party leases with the CHA and the private

management companies under which they can be evicted for drug-use. Yet, this provision, which is required under federal law, simply allows a landlord to terminate a public housing tenant's lease because of illegal drug-use. The provision is not a part of the drug screening policies imposed by HMC and TCB.

Plaintiffs' alternative argument that CHA is indirectly responsible for the drug testing policies, based on a "symbiotic relationship" argument also fails to show sufficient evidence that CHA is behind the testing.[6] The evidence in the record demonstrates that CHA acquiesced in the inclusion of the drug testing policy, but that it otherwise took no affirmative position. Yet, the mere fact of a mutually beneficial contract with the government entity does not render the private actor a state actor for all purposes. *ALPA*, 45 F.3d at 1150. Undoubtedly, CHA assisted in the planning and financing of the mixed-income developments. The purpose of the redevelopment plan was, after all, to provide housing to CHA residents. Similarly, the CHA necessarily exerts control over the minimum tenant selection criteria since the units at issue are to be occupied by public housing residents. Rather than mandating the drug testing as argued by plaintiffs, the CHA took the position that if a private developer wanted to require any additional requirements beyond the minimum TSP, such as drug testing as a condition of occupancy, then CHA required only that the additional conditions apply to all tenants regardless of whether they were CHA residents, affordable rate, or market rate tenants. The record demonstrates that CHA was not driving the drug testing policies of the mixed-income developments nor did it administer or enforce the policies. Indeed, if CHA were pushing the drug testing, it was not doing a very good job, particularly if it had the control over the process that plaintiffs claim since only 10 of the 32 mixed-income developments had drug screening. Essentially, plaintiffs are asking this Court to find state action based on CHA's failure to prohibit the

---

[6] Whether the Court uses the term "symbiotic relationship" or close nexus, the analysis is substantially the same. Under the facts in the record, is the CHA's relationship to the private developers' drug testing policy sufficiently close to be considered state action.

11

private developers from imposing the policy by not rejecting their proposed TSPs.

>   *2. Consent*

Even if the Court were to find state action, if plaintiffs consented to the drug testing then no constitutional violation occurred. "[A] search conducted pursuant to valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Plaintiffs contend that any consent was not voluntary, but was necessarily coerced because their submission to the testing meant they could stay in their current home. Defendants focus on the fact that plaintiffs agreed to the testing, repeatedly, and in the case of Peery signed a waiver. Defendants also argue that each plaintiff acknowledged that they had options of where to live within CHA's relocation program, including units within their target locations that did not mandate drug testing as a condition of lease. CHA asserts that plaintiffs could (and still can) apply for transfer to units in other developments. CHA personnel testified that they would have approved Peery's request for a transfer had he made one.

CHA distinguishes the case *Lebron v. Sec'y, Fla. Dep't of Children & Families*, 710 F.3d 1202, 1217 (11th Cir. 2013), on which plaintiffs heavily rely. In *Lebron*, the court affirmed the district court's order enjoining the State of Florida from requiring the plaintiff to submit to a suspicionless drug test as a condition of the receipt of government-provided monetary assistance for which he was otherwise qualified. *Id.* at 1205. There, Florida enacted a statute that mandated drug testing for participation in the State's Temporary Assistance for Needy Families program. In *Lebron*, unlike here, not only was there no question of state action (it was a Florida statute), but the requirement was only imposed on low-income individuals and the result of refusal was denial of benefits.

Here, the private developers' drug testing policies are applied to all tenants, not just CHA tenants, and the consequence of refusing to submit to the test is not the loss of CHA housing subsidies but only eviction from that particular unit. There is no constitutional right to public housing at any particular location. *Fincher v. South Bend Heritage Foundation*, 606 F. 3d 331, 334 (7th

Cir. 2010). The record here indicates that plaintiffs' choice to remain at Parkside and Oakwood Shores despite the drug testing policies at each when they had options for units in nearby developments without the drug screening was not coerced or the product of duress. *See Schneckloth,* 412 U.S. at 227. Further, no one has ever been evicted from any of Parkside's 503 units for a failed drug test. None of the plaintiffs sought a transfer or formally complained of the drug screening. Instead, they consented to the annual testing.

      B.      *The Remaining Elements of a Preliminary Injunction*

The remaining elements of a preliminary injunction are: no adequate remedy at law; irreparable harm if no injunction imposed; and balance of harms. Here, the Court finds that plaintiffs fail to meet their burden to show a likelihood of success on the merits. Therefore, the Court need not address the remaining factors. *See Kiel v. City of Kenosha*, 236 F.3d 814, 817 (7th Cir. 2000).

**IV. Conclusion**

Based on the foregoing, this Court finds that plaintiffs failed to meet their burden to persuade this to impose a preliminary injunction. This Court therefore denies plaintiffs' motions for preliminary injunction.

IT IS SO ORDERED.

Date: September 30, 2014

Entered _____

United States District Judge